UNITED STATES of America
v.
John Christopher FONTANA, Appellant.

UNITED STATES of America
v.
Frank PHILLIPS, Appellant.

UNITED STATES of America
v.
Mike F. SICILIA, Appellant.

Nos. 11601–11603.

United States Court of Appeals Third Circuit.

Argued Oct. 21, 1955.

Decided March 29, 1956.

See, also, 126 F.Supp. 711.

Louis C. Glasso, Pittsburgh, Pa. (Joseph A. Rossi, Pittsburgh, Pa., on the brief), for appellants.

D. Malcolm Anderson, Jr., Pittsburgh, Pa. (John W. McIlvaine, U. S. Atty., Western District of Pennsylvania, Martin M. Sheinman, Asst. U. S. Atty., Pittsburgh, Pa., on the brief), for appellee.

Before McLAUGHLIN, KALODNER and STALEY, Circuit Judges.

KALODNER, Circuit Judge.

The defendants in these appeals were found guilty, with others, of violating 18 U.S.C. § 241, i. e., conspiring "to injure, oppress * * * any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution * * *." The conspiracy may be summarized in the statement that the defendants allegedly forged voters' registration cards or certificates and cast fictitious and false ballots—in common parlance, referred to as "stuffing" ballot boxes—in a congressional

election. See United States v. Saylor, 1944, 322 U.S. 385, 64 S.Ct. 1101, 88 L.Ed. 1341.

The defendants here on appeal assert that the trial court erred in refusing to hear suggestions as to the charge out of hearing of the jury, contrary to Rule 30 of the Federal Rules of Criminal Procedure, 18 U.S.C.; that it erred in refusing to require production by the government of written statements given by its key witness, an admitted participant in the conspiracy who was not indicted; and that it further erred in not permitting cross-examination of this witness with respect to the statements. These errors are deemed by the defendants to be cause for a new trial. In addition, the defendant Fontana urges that the evidence against him was inadequate and that, accordingly, his motion for judgment of acquittal should have been granted.

■ We put aside the defendants' argument based on Rule 30 of the Criminal Rules, since it does not appear that they were prejudiced by non-compliance. The defendants made no objection or suggestion which they contend the jury ought not to have heard, and they do not now claim that they refrained from making an objection or suggestion on this account.

■ Likewise, we put aside the defendants' arguments based upon an earlier refusal of the trial court to direct production of the written statements involved. The existence of those statements was disclosed in the cross-examination of the government's key witness, Patsy D'Achille.[1] Although the defendants' initial demand for the statements was rejected, subsequently, during the examination of an agent of the Federal Bureau of Investigation who took them from D'Achille,[2] the trial court caused them to be produced and permitted defense counsel to study them. Accordingly, whether the defendants were entitled to the written statements need not now detain us. We may point out, incidentally, that D'Achille stated on cross-examination that the statements were substantially consistent with his testimony; whether in such circumstance the defendants would have been entitled to their production at the time of demand is not free from doubt: United States v. Krulewitch, 2 Cir., 1944, 145 F.2d 76, 156 A.L.R. 337; United States v. Lebron, 2 Cir., 1955, 222 F.2d 531, 536–537; Scanlon v. United States, 1 Cir., 1955, 223 F.2d 382, 385–386.

■ We are of the opinion, however, that the defendants should have a new trial because of the limitation of the right of examination imposed upon them insofar as the witness D'Achille is concerned.

As already stated, the existence of D'Achille's written statements, three in number, was first revealed on cross-examination. The rejection of defendants' request for production of the statements was premised upon the ground that they had not been used by the government or the witness and were not the subject of direct examination. The trial court suggested that if the government called the agent who took the statements, and used them, they would be made available to the defendants, and if they were inconsistent with D'Achille's testimony,

1. D'Achille was majority inspector of the Election Board in the City of New Kensington, Pennsylvania, where the alleged ballot-box stuffing occurred. He was not indicted, having turned government witness after admitting his participation in the conspiracy charged. Defendant John Christopher Fontana, defendant-appellant (No. 11,601) was clerk of the Election Board; Michael F. Sicilia, defendant-appellant (No. 11,603) was Judge of Elections; Frank Phillips, defendant-appellant (No. 11,602) was a non-member of the Election Board charged with a key role in the conspiracy. All three were fined and sentenced to prison terms.

2. D'Achille was the sole government witness who directly connected the defendants with the ballot-box stuffing. Other goverment witnesses had established that they had not voted although ballots were cast in their names at the election in question.

the defendants would be permitted to recall him for further cross-examination. It was upon this ground also that the trial court refused to permit, at that time, cross-examination of D'Achille concerning the statements. Consequently, the defendants succeeded in developing only some general facts as to when the statements were taken. At the close of the government's case, the request for production of the statements was renewed by the defendants, but again denied on the ground that their purpose was impeachment and that no inconsistency was shown.

The defendants, as part of their case, called the Federal Bureau of Investigation agent, and it was at this time that the court directed the production of D'Achille's statements. Defendants then called D'Achille. The trial court ruled that in view of the fact that D'Achille was a government witness, defendants could "search him out", but were bound by what he said. However, the defendants were not permitted to interrogate D'Achille on matters contained in his statements. Instead, the trial court directed that any inconsistencies between D'Achille's testimony and his statements could be shown only by reading the statements to the jury and

by defendants' argument to the jury. The defendants, after having read the statements to the jury, attempted to examine D'Achille with respect to them, but were stopped from so doing.

We think the unfortunate result of this procedural straight jacket was to deprive the defendants of reasonable opportunity to explore the credibility, recollection, or bias of the government's primary witness. At no time were the defendants permitted to deal completely and thoroughly with this witness on the score of his written statements. That they are inconsistent both as to each other and as to D'Achille's testimony is apparent. While it is true that some differences are minor, nevertheless there are some of significance, particularly as to times and as to persons involved. Thus, D'Achille's first statement makes no mention of ballot box stuffing. His third statement is more extensive than the other two. And, his testimony differs on the part played in the conspiracy by the defendant Fontana. It is evident that D'Achille was, to say the least, plainly wrong in declaring that the written statements were "full" and substantially the same as his testimony at the trial.[3]

---

3. In his first written statement (listed as Defendant's Exhibit F), D'Achille said (N.T. p. 628):

"When the counting of the ballots was completed, Mike Sicilia sealed the ballot box. Then Mike, *accompanied by John Fontana* and I, took the ballot box and supplies, in Mike's car, to Greensburg, where Mike turned them in. We left about eleven forty-five p. m., from New Kensington and drove directly to Greensburg, without stopping." (Emphasis supplied.)

This same statement was repeated in almost identical words in D'Achille's third statement to the F.B.I. (N.T. p. 632). However, when D'Achille was examined on the stand as to this occurrence, he testified (N.T. p. 114):

"Q. After the seal was affixed to the box, what was done with it? A. *Mr. Sicilia* and I took it over to Greensburg."

And again (N.T. p. 126):

"Q. * * * And then *you and Mike* went over to Greensburg? A. That's right." (Emphasis supplied.)

In his third written statement (N.T. p. 636) D'Achille placed Fontana at the polls while the ballots were being counted:

"* * * While the ballots were being counted * * * John Fontana * * * watched the counting."

At the trial, however, D'Achille testified Fontana was *not* present when the ballots were counted (N.T. 118, 120):

"Q. He (Fontana) was there after the polls closed? A. Yes, sir.

"Q. At what hours? A. Oh, I would say about a little after eight.

"Q. You mean he came in a little after eight? A. No, he was there, and he left a little after eight.

*       *       *       *       *

"Q. These activities that you spoke of after the polls closed, he had no part in, did he? A. In what activities?

"Q. After the polls closed, you said that you and others— A. No, he didn't.

"Q. He was not there and had nothing to do with it? A. No, he didn't."

In this context, it appears to us to be of paramount importance that the defendants have the necessary elbow room to "search out" D'Achille. While no use was made by the government, or the witness, of the statements, nevertheless D'Achille had, on the government's direct examination, covered the ground encompassed by the statements. The statements were highly relevant and directly related to the very matters under investigation. They were not merely collateral. The testimony of D'Achille was under proper attack and the defendants were entitled to interrogate him about his prior statements both to prove what actually occurred and to show his lack of candor or recollection. Under the circumstances, the trial court's strict application of the general rule that cross-examination be confined to the scope of direct examination operated as a restriction of cross-examination beyond the area of permissible judicial discretion. As was stated in Alford v. United States, 1931, 282 U.S. 687, 692, 51 S.Ct. 218, 219, 75 L.Ed. 624:

"Prejudice ensues from a denial of the opportunity to place the witness in his proper setting and put the weight of his testimony and his credibility to a test, without which the jury cannot fairly appraise them."

Although D'Achille's statements were subsequently read to the jury, we are unable to say that this was an adequate substitute for the right of examination. It did not assist in developing the facts, nor did it adequately test the recollection, bias and truthfulness of D'Achille. These are elements fundamental to administration of criminal justice. As stated in Asgill v. United States, 4 Cir., 1932, 60 F.2d 776, 779:

" * * * the idea that lies at the bottom of all cross-examination (is) * * * that it is designed, not only to develop the facts of a case, but to test the witness in matters of recollection, of prejudice or bias, and of truthful statement."

And as stated in Heard v. United States, 8 Cir., 1919, 255 F. 829, 832:

"The government had called him as its chief witness, and relied upon him to establish its charge. * * * It was proper, relevant, and material cross-examination to draw forth from this witness the fact that, when the transaction was recent and his recollection was fresh, he had told a different story, one so inconsistent with that to which he had testified that both stories could not be true. * * * The cross-examiner has the right to prove by his adversary's witness, if he can, what inconsistent statements he has made, not only in general, but in every material detail, for, the more specific and substantial the contradictory statements were, the less credible is the testimony of the witness."

Again, while the defendants were permitted to call D'Achille and to "search him out", this was of no avail, for although then equipped with D'Achille's written statements, they were not permitted to question him with respect to them but were restricted to reading them aloud to the jury. To permit the defendants at this juncture to fully implement the trial court's ruling that D'Achille could be "searched out" comports with a nice perception of the requirements of fairness and justice. There was every reason for such permission, since the defendants did not earlier have D'Achille's written statements before them. And a timely perusal of the statements would have indicated the necessity for the further examination of the witness. The result of the procedure adopted in the court below was that the jury was given the burden of resolving inconsistencies, without the additional opportunity normally accorded to defendants, to amplify the record upon which the jury could perform its function of resolving the facts by establishing those factors pertinent to acceptance of a witness' testimony, that is, recollection, prejudice or bias and

truthfulness; these were of exceptional importance to the defendants where D'Achille was concerned.

█ Finally, as to the defendant Fontana's contention that the evidence against him was inadequate, we are of the opinion that it did not so clearly exclude him from complicity that we should direct an acquittal. Bryan v. United States, 1950, 338 U.S. 552, 70 S.Ct. 317, 94 L.Ed. 335.

For the reasons stated the judgments of conviction against the defendants on these appeals will be reversed and the cause remanded for further proceedings not inconsistent herewith.